CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

JUL 25 2022

JULIA C. DUDLEY, CLERK
BY: s/ H. MCDONALD
    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | |
|---|---|
| RENEE R.[1], | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | )  Civil Action No. 4:21cv00023 |
| | ) |
| KILOLO KIJAKAZI, | ) |
| **Acting Commissioner of Social Security,** | ) |
| | ) |
| | ) |
| **Defendant.** | ) |

## REPORT AND RECOMMENDATION

Plaintiff Renee R. ("Renee") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") finding her not disabled and therefore ineligible for disability insurance benefits ("DIB") under the Social Security Act ("Act"). 42 U.S.C. §§ 401–433. Renee alleges that the Administrative Law Judge ("ALJ") erred by failing to properly: (1) assess her mental impairments; (2) determine her RFC, including using a function-by-function analysis; and (3) assess her allegations regarding her symptoms.

I conclude that substantial evidence supports the Commissioner's decision in all respects. Accordingly, I **RECOMMEND GRANTING** the Commissioner's Motion for Summary Judgment (Dkt. 21) and **DENYING** Renee's Motion for Summary Judgment (Dkt. 16).

## STANDARD OF REVIEW

This court limits its review to a determination of whether substantial evidence exists to

---

[1] Due to privacy concerns, I use only the first name and last initial of the claimant in social security opinions.

support the Commissioner's conclusion that Renee failed to demonstrate that she was disabled under the Act.[2] Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and alterations omitted); see also Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (emphasizing that the standard for substantial evidence "is not high"). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." Mastro, 270 F.3d at 176 (quoting Craig v. Chater, 76 F.3d at 589). Nevertheless, the court "must not abdicate [its] traditional functions," and it "cannot escape [its] duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

## CLAIM HISTORY

Renee filed for DIB in September 2018, claiming her disability began on November 14, 2013, due to traumatic brain injury, COPD, fibromyalgia, restless leg syndrome, carpal tunnel syndrome in her wrists, arthritis in both legs, diabetes, anxiety and panic attacks, depression, and severe paranoia and rage episodes. R. 126, 251. Renee's date last insured was December 31,

---

[2] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work. Rather, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. See 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

2014[3]; thus, she must show that her disability began on or before this date and existed for twelve continuous months to receive DIB. R. 17, 273; 42 U.S.C. §§ 423(a)(1)(A), (c)(1)(B), (d)(1)(A); 20 C.F.R. §§ 404.101(a), 404.131(a). The state agency denied Renee's application at the initial and reconsideration levels of administrative review. R. 125–37, 140–52. On September 16, 2020, ALJ H. Munday held a hearing to consider Renee's claim for DIB. R. 44–87. Counsel represented Renee at the hearing, which included testimony from vocational expert Andrew Beale, Ph.D. On September 30, 2020, the ALJ entered a decision analyzing Renee's claim under the familiar five-step process[4] and denying her claim for benefits. R. 15–31.

The ALJ found that Renee was insured at the time of the alleged disability onset and that she suffered from the severe impairments of heel spurs, plantar fasciitis, diabetes, peripheral neuropathy, obesity, traumatic brain injury, depression, anxiety, attention deficit disorder, and personality disorder.[5] R. 19. The ALJ determined that these impairments, either individually or in combination, did not meet or equal a listed impairment. Id. The ALJ specifically considered listing 1.02 (major joint dysfunction), listing 9.00 (endocrine disorders), listing 11.14 (peripheral neuropathy), listing 11.18 (traumatic brain injury), listing 12.02 (neurocognitive disorders), listing 12.04 (depressive, bipolar, and related disorders), listing 12.06 (anxiety and obsessive-

---

[3] Renee was 51 years old on her date last insured, closely approaching advanced age under the Act. R. 30, 125.

[4] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R.§ 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. At the fifth step, the burden shifts to the Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

[5] The ALJ found that all other impairments alleged in the record were non-severe, including Renee's COPD. R. 19.

3

compulsive disorders), listing 12.08 (personality and impulse-control disorders), and listing 12.11 (neurodevelopmental disorders). The ALJ also considered obesity as required by SSR 19-2p. The ALJ found that regarding her mental impairments, Renee had moderate limitations in understanding, remembering, or applying information, interacting with others, and concentrating, persisting, or maintaining pace, and a mild limitation in adapting or managing oneself. R. 21.

The ALJ concluded that Renee retained the residual functional capacity ("RFC") to perform a limited range of light work. R. 22. Specifically, Renee can only occasionally crawl, climb ladders, ropes, or scaffolds, and be exposed to vibrations and hazardous conditions, including unprotected heights and moving machinery. Id. She can frequently balance, stoop, crouch, climb ramps or stairs, and operate foot controls with the bilateral lower extremities. Id. Renee can perform simple, routine tasks in low stress work, defined as few workplace changes, with occasional interaction with the general public and coworkers. Id. The ALJ determined that Renee was unable to perform her past relevant work as a mental health technician and supervisory group home composite job: 1 mental health technician, 2 residential supervisor, and family counselor, but could perform jobs that exist in significant numbers in the national economy, such as cleaner, sorter, and inspector. R. 29–30. Thus, the ALJ determined that Renee was not disabled at any time from the alleged onset date of November 14, 2013 through December 31, 2014, the date last insured.[6] R. 31. Renee appealed the ALJ's decision, and the Appeals Council denied her request for review on March 18, 2021. R. 1–3.

---

[6] The ALJ also denied Renee's request to reopen a prior ALJ decision denying benefits in 2016. R. 16. The ALJ explained that the new SSA regulations for adjudicating cases involving mental impairments, effective January 17, 2021, means that "an ALJ cannot apply the doctrine of administrative res judicata to a Title II case involving a mental impairment on which a prior final determination or decision was issued prior to January 17, 2017, even if no new facts are presented and even if insured status expired before the date of the prior final determination or decision." R. 16-17. Instead, the ALJ is required to apply the regulations effective January 17, 2017 and issue a decision on the merits.

## ANALYSIS

Renee alleges that the ALJ failed to properly assess her mental impairments, determine her RFC using a function-by-function analysis, and assess her allegations regarding her symptoms.

**A. Medical History Overview**

1. Medical Treatment and Opinions

In March 2011, about two years prior to her alleged onset date, Renee was hit by a truck at low speed and struck her head on the pavement. R. 1786. A CT scan of her brain was normal, as compared to a prior scan, and she was diagnosed with a closed head injury and neck/back sprain. R. 646, 1788, 1793. Renee began treating with a neurologist, Francis Walsh, M.D. following the accident, who noted Renee had developed post-traumatic headaches, but found "no evidence of brain injury at this point." R. 2518. Subsequent CT scans in November 2013 and January 2014, both close in time to her alleged onset date of November 14, 2013, were also normal. R. 642, 646.

In August 2013, Dr. Walsh completed a Request for Accommodation form from Patrick Henry Community College for Renee, indicating she suffered from chronic pain and headaches with secondary depression and cognitive problems. R. 2467. Renee's primary care doctor, Jack Bumgardner, M.D., referred her to William Wellborn, Ph.D. for evaluation of neurocognitive deficits following her 2011 head injury. R. 658. Renee reported issues with retaining and understanding information, attention, focus, and depression and Dr. Wellborn diagnosed anxiety and depression and recommended neuropsychological testing. R. 659, 661. Ann Sollinger, Ph.D. performed a neuropsychological evaluation in January 2014, recording Renee's reports of difficulties with memory and thinking, multitasking, attention, word-finding, depression, anxiety,

5

PTSD, and panic attacks, as well as neuropathy in her legs and feet, and head and neck pain. R. 2613–14. Dr. Sollinger indicated that Renee's scores on "formal and embedded measures of performance validity testing" suggested Renee was not consistently engaged in the testing during the evaluation, which made the test results invalid, specifically noting that the "findings may underestimate her true cognitive abilities." R. 2616, 2618. Thus, Dr. Sollinger wrote that "no impairments may be confirmed; however, scores not indicating impairment would suggest at least average-range functioning in that cognitive domain." R. 2618. Dr. Sollinger recommended further intervention regarding Renee's psychological distress. R. 2619. Dr. Wellborn reviewed Dr. Sollinger's evaluation with Renee in January 2014 and recommended that Renee follow up with her therapist case manager at Brain Injury Services to find a therapist to treat her depression. R. 2620.

Renee's Brain Injury Case Manager, Jodi Judge, completed a Function Report in April 2014, noting she generally sees Renee monthly. R. 2732–39. She reported that Renee's personal care is "haphazard, sometimes appearing messy or unkempt," and she uses memory aids including calendars and an alarmed pill box, but that she can shop and drive. Ms. Judge also found Renee's emotional instability concerning and noted her headaches would impact her ability to participate in activities. She found limitations with lifting, squatting, bending, standing, reaching, walking, kneeling, stair climbing, memory, completing tasks, concentration, understanding, following instructions, and getting along with others and wrote that Renee's "headaches, emotional instability, cognitive deficits and physical impairments would make gainful employment extremely difficult." R. 2739.

Renee continued to follow up with Dr. Walsh and her case manager in the relevant period and saw a therapist several times, in May and June 2014 reporting depression, pain, and

cognitive issues; at her two follow-up appointments, her therapist indicated generally normal mental status exams. R. 2743–51.

Renee also suffered from foot pain during the relevant period and was treated for heel spurs, plantar fasciitis, diabetes, and neuropathy. R. 1262, 2470, 2662, 2986. Renee was put in a walking boot in September 2013, due to her heel spurs and had a left foot x-ray in November 2013 to evaluate hammertoe and heel pain, which showed mild degeneration in the first toe joint, but no fracture. R. 1262, 2611. Renee began physical therapy in June 2014 but was discharged after missing appointments; she received a lace-up ankle boot from her podiatrist in September 2014, which she reported "helped significantly." R. R. 609–11, 1256–57. Renee received similar treatment in the months after her date last insured in December 2014, including additional physical therapy, and continued follow-ups with Dr. Walsh for pain, headaches, and medication.

The state agency doctors and psychologists all found there was insufficient evidence to fully evaluate Renee's disability claim and that the evidence needed could not be obtained; thus, they determined that her condition was not disabling through the date last insured of December 31, 2014. R. 125–37, 140–52. In a Medical Opinion: Re: Ability to do Work-Related Activities (Mental) Esther Reynolds, LPC, who only began treating Renee in April 2018, indicated work preclusive limitations beginning in April 2016, after Renee's date last insured, including being absent more than three times per month. R. 3355–59.

**B. Mental Impairments under SSR 96-8P**

Renee argues that the ALJ failed to properly assess her mental impairments as required by SSR 96-8P.[7] See Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims,

---

[7] Social Security Rulings are "final opinions and orders and statements of policy and interpretations" that the Social Security Administration has adopted. 20 C.F.R. § 402.35(b)(1). Once published, these rulings are binding on all components of the Social Security Administration. Heckler v. Edwards, 465 U.S. 870, 873 n.3 (1984); 20

7

SSR 96-8P (S.S.A. July 2, 1996). Specifically, Renee states that the ALJ failed to properly consider her moderate limitations in concentration, persistence, or pace and interacting with others[8] by only "address[ing] skill level and [Renee's] ability to perform work activity and [not Renee's] ability to sustain work over the course of an eight hour workday" or her ability to stay on task. Pl.'s Br. at 34, 36, Dkt. 17.

SSR 96-8P requires the ALJ to include a narrative discussion describing how the evidence supports his conclusions when developing the RFC. Teague v. Astrue, No. 1:10-cv-2767, 2011 WL 7446754, at *8 (D.S.C. Dec. 5, 2011). The ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8P at *7; Meadows v. Astrue, No. 5:11-cv-63, 2012 U.S. Dist. LEXIS 115150, at *24, 2012 WL 3542536, at *8 (W.D. Va. Aug. 15, 2012) (citing Davis v. Astrue, No. 9-cv-2545, 2010 U.S. Dist. LEXIS 132972, at *15-16, 2010 WL 5237850, at *5 (D. Md. Dec. 15, 2010)); Monroe v. Colvin, 826 F.3d 176, 189, (4th Cir. 2016) (emphasizing that the ALJ must "build an accurate and logical bridge from the evidence to his conclusion" and holding that remand was appropriate when the ALJ failed to make "specific findings" about whether the claimant's limitations would cause him to experience his claimed symptoms during work and if so, how often).

In Shinaberry v. Saul, the Fourth Circuit clarified that an "ALJ cannot summarily 'account for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work,' because 'the ability to perform

---

C.F.R. § 402.35(b)(1). "While they do not have the force of law, they are entitled to deference unless they are clearly erroneous or inconsistent with the law." Pass v. Chater, 65 F.3d 1200, 1204 n.3 (4th Cir. 1995).

[8] The ALJ also assessed moderate limitations in understanding, remembering, or applying information, but Renee does not allege any specific error or make any arguments regarding this domain.

8

simple tasks differs from the ability to stay on task.'" Shinaberry v. Saul, 952 F.3d 113, 121 (4th Cir. 2020)[9] (quoting Mascio v. Colvin, 780 F.3d 632, 638 (4th Cir. 2015)). However, Mascio does "not impose a categorical rule that requires an ALJ to always include moderate limitations in concentration, persistence, or pace as a specific limitation in the RFC." Id. Indeed, "a categorical rule, applying to every case" is not often appropriate in these circumstances; instead, the inquiry "as is usually true in determining the substantiality of evidence, is case-by-case" taking into account the whole of the administrative record and deferring to the ALJ. Biestek, 139 S. Ct. 1148 (discussing a vocational expert's refusal of a request for underlying data). Likewise, as the Commissioner points out, the regulations have also changed since Mascio, clarifying that a "'moderate' rating means that the individual has a 'fair' ability to sustain concentration, persistence, or pace 'independently, appropriately, effectively' and 'on a sustained basis.'" See C.F.R. pt. 404, subpt. P, app'x 1, § 12.00(F)(2).

In support of her argument that the ALJ failed to explain how the RFC accommodated her moderate limitations in concentration, persistence, or pace, Renee points to a Function Report from Ms. Judge where she noted plaintiff's limited ability to complete tasks, concentrate, and understand and follow instructions (R. 2737) as well as the neuropsychological evaluation conducted by Dr. Sollinger (R. 2613). However, the ALJ considered both these records, noting that Ms. Judge's opinion on functional limitations is not persuasive, as it was not supported by or consistent with the medical treatment records including mental status examinations generally documenting normal memory, attention, and concentration, and objective findings showing average cognitive function. R. 28. The ALJ also explained that Ms. Judge appeared to base her

---

[9] Instead, Shinaberry highlights "sister circuits" who conclude that "limiting the hypothetical to include only unskilled work sufficiently accounts for such limitations [in concentration, persistence, or pace]" when the "medical evidence demonstrates that a claimant can engage in simple, routine tasks, or unskilled work, despite [these] limitations." Id. (quoting Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1180 (11th Cir. 2011)).

9

comments on Renee's own subjective reports, rather than objective findings. Id. Likewise, the ALJ discussed Dr. Sollinger's evaluation, including noting that "though [Renee's] test results were invalid and no impairment could be confirmed" the scores not indicating impairment suggested an average range of functioning. R. 21. Indeed, Dr. Sollinger specifies that that "findings may underestimate [Renee's] true cognitive abilities." R. 2616

In support of her argument that the ALJ failed to explain how the RFC accommodates her moderate limitations in interacting with others, Renee asserts that the "ALJ's only discussion regarding [her] moderate limitations occur" during the listing discussion. Pl.'s Br. at 37, Dkt. 17. During her listing discussion, the ALJ acknowledged Renee's testimony that she had anxiety and panic attacks and did not "like being around others at times," and the ALJ noted that, other than some findings of depressed mood and affect, Renee had normal mood and affect and appropriate behavior and eye contact. R. 21. However, contrary to Renee's claim, the ALJ also discussed this domain elsewhere in her opinion, explaining that the social limitations in the RFC, of occasional interaction with the general public and coworkers, addressed the concerns of Dr. Walsh, including panic attacks and anxiety. R. 28. The ALJ discussed this domain again later, explaining that the additional RFC limitation, as compared to a previous ALJ decision denying benefits in July 2016, to occasional interaction with coworkers, "is supported by [Renee's] complaints of difficulties with focus." R. 29.

The medical evidence supports the ALJ's conclusion that, despite her moderate limitations, Renee was capable of performing the basic mental demands of light work for the relevant period between November 14, 2013 and December 31, 2014. Further, the ALJ explained why Renee's moderate limitations in understanding, remembering, or applying information, interacting with others, and concentrating, persisting, or maintaining pace did not translate into a

10

limitation in the RFC beyond performing simple, routine tasks in low stress work, defined as few workplace changes, with occasional interaction with the general public and coworkers. R. 22. The ALJ adequately supported her finding that Renee could sustain her tasks over a normal workday and accounted for her moderate impairments in her hypothetical questions to the vocational expert and the RFC.

### C. Physical RFC and Function-by-Function Analysis

Renee argues that the ALJ's physical RFC findings are not supported by substantial evidence. Renee states that the ALJ "failed to conduct a function by function analysis and failed to make any specific findings about" her inability to sit more than 30 minutes or stand more than 15 minutes, need to "lie down as needed throughout the day," and the frequency of her absences from work. Pl.'s Br. at 40, Dkt. 17. Renee does not cite to any specific records to support her argument, but instead cites to her testimony during the hearing. However, as the Commissioner points out, because the ALJ did not find Renee's allegations entirely supported by the record, the ALJ had no obligations to adopt her testimony regarding her limitations wholesale.

A function-by-function analysis requires the ALJ to develop an adequate RFC which accounts for the work activities the claimant can perform given the physical or mental impairments affecting his ability to work. Importantly, the ALJ must explain the conclusions reached and explain any record evidence which contradicts the RFC determination. See SSR 96-8p; see also Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (emphasizing that an ALJ needs to provide an explanation linking medical evidence listed in the decision to his ultimate findings). The ALJ is instructed to cite specific medical facts and non-medical evidence supporting his conclusion, discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis, describe the maximum amount of

each work-related activity the individual can perform, and explain how any material inconsistencies or ambiguities in the evidence were considered and resolved. SSR 96-8p, 1996 WL 374184, at *7.

In Mascio v. Colvin, the court rejected a "per se rule requiring remand when the ALJ does not perform an explicit function-by-function analysis," agreeing instead with the Second Circuit that "'[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review.'" Mascio, 780 F.3d at 636 (citing Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013)). "The Mascio Court held remand was necessary, in part, because the ALJ failed to indicate the weight given to two residual functional capacity assessments which contained relevant conflicting evidence regarding the claimant's weight lifting abilities." Newcomb v. Colvin, No. 2:14–CV–76, 2015 WL 1954541, at *3 (N.D.W. Va. Apr. 29, 2015).

Here, the ALJ's decision includes the narrative discussion required by SSR 96-8p, and contains sufficient information to allow meaningful review. Unlike the ALJ in Mascio, the ALJ in this case did not fail to consider conflicting medical evidence. Further, the court is "not left to guess about how the ALJ arrived at her conclusions" because the ALJ's findings include a comprehensive analysis of Renee's medical records, the medical opinions, Renee's hearing testimony, and the ALJ's conclusions. R. 22–31. The ALJ acknowledged Renee's testimony regarding her need to lie down and her limited ability to sit, but explained these were inconsistent with medical records showing normal gait, strength and reflexes, "essentially no objective spine findings" except for some tenderness, and only a single reference to needing to lie down during the day to her case manager, in March 2014. R. 23, 26–27.

Likewise, the ALJ specifies how the limitations in the RFC correlate with Renee's severe impairments. The ALJ noted that while Renee's right ankle "showed some laxity" she reported that her ankle brace "helped significantly" and that while she had varying symptoms of decreased sensation in the lower extremities, providers generally documented normal gait, strength, and reflexes. R. 27. Thus, the ALJ explained that the "limitation to the light exertional level, frequent foot controls, and the postural and environmental limitations is supported by the medical records and consistent with the objective findings therein . . . ." Id. Accordingly, I recommend finding that substantial evidence supports the ALJ's RFC determination.

### D. Subjective Allegations

Renee argues that the ALJ's assessment of her allegations is not supported by substantial evidence. Renee points to several "inconsistent statements and presentations" referenced by the ALJ, which she characterizes as "very minor instances[10]" and argues that the ALJ mischaracterized the results of Dr. Sollinger's neuropsychological testing. Pl.'s Br. at 41–42. Renee contends that the ALJ failed to explain why the evidence was inconsistent with her allegations regarding her ability to sit, stand, or lie down, her panic attacks, right ankle issues, and difficulties with concentration, memory and driving. Finally, Renee argues that the ALJ erred by relying on her daily activities to show she is capable of working.

---

[10] As Renee speculates, when the ALJ references the following inconsistent statement, she is referring to the wrong record cite:

> At a visit to Dr. Walsh in March 2012, [Renee] reported that she had someone drive her as she had a rental car after driving hers in a ditch, but Dr. Walsh observed her getting into a "big pickup truck" and driving herself away.

R. 27. This statement is actually located in the case notes section for Outpatient/Inpatient Rehabilitation Records from Brain Injury Services of Southwest Virginia, as follows, "Renee told the doctor a friend drove her to the appointment because she ran her automobile into a ditch. Afterward, the doctor witnessed her climbing into a pickup truck and driving away." R. 1090.

13

Under the regulations implementing the Social Security Act, an ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms. Soc. Sec. Ruling 16-3p Titles II & Xvi: Evaluation of Symptoms in Disability Claims, SSR 16-3P, 2017 WL 5180304 (S.S.A. Oct. 25, 2017); 20 C.F.R. §§ 404.1529(b)–(c), 416.929(b)–(c). First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms, such as pain.[11] Id. at *3, §§ 404.1529(b), 416.929(b). Second, the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to work. Id. §§ 404.1529(c), 416.929(c). In making that determination, the ALJ must "examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." Id.

The ALJ discusses Renee's medical history and treatment, as well as her own allegations, and the ALJ adequately explained her finding that Renee's allegations were not entirely consistent with the medical evidence and other evidence in the record. Renee contends that her failure to maintain adequate test engagement across all tasks during Dr. Sollinger's assessment actually shows she was "unable to maintain sufficient concentration and focus [] to complete testing" and supports her disability claim. This argument is misplaced and the ALJ correctly

---

[11] SSR 16-3p states that a claimant must provide "objective medical evidence from an acceptable medical source to establish the existence of a medically determinable impairment that could reasonably be expected to produce [the] alleged symptoms." Id. Objective medical evidence consists of medical signs ("anatomical, physiological, or psychological abnormalities established by medically acceptable clinical diagnostic techniques") and laboratory findings "shown by the use of medically acceptable laboratory diagnostic techniques." Id.

14

considered Dr. Sollinger's opinion. Dr. Sollinger referred to Renee's scores on "formal and embedded measures of performance validity testing," and not her ability to focus or concentrate – instead, Dr. Sollinger wrote that an inability to be consistently engaged "may occur for a number of reasons, but when it does it raises questions regarding the validity of the test results." R. 2616. Dr. Sollinger emphasized that Renee was referred for an assessment of "her current cognitive functioning" and specified his findings my actually "underestimate her true cognitive abilities." R. 2616–18.

The ALJ also acknowledged Renee's testimony at the hearing, including her 2011 traumatic brain injury, her difficulty sitting and standing, need to lie down, memory issues, plantar fasciitis, and anxiety and depression. R. 23. However, the ALJ found that Renee's statements about "the intensity, persistence, and limiting effects of her symptoms" are not consistent with the record evidence. R. 26. In support, the ALJ noted "essentially no objective spine findings except for some tenderness" and normal gait, strength and reflexes as contradicting her allegations regarding her ability to sit and stand and her ankle issues, as well as no documentation of either a need to lie down frequently during the day, or frequent panic attacks. R. 26–27. The ALJ highlighted that, though Renee testified she could drive only a little bit, the record shows she continued to drive, even long distances, including to Roanoke, Northern Virginia, and South Carolina. R. 27. Regarding her allegations related to mental impairments, the ALJ noted Renee's mental status exams generally documenting normal memory, attention, and concentration, as well as scant mental health treatment, no hospitalizations, and no evidence of intracranial abnormality or a traumatic injury in brain imaging. Id.

Contrary to Renee's argument, the ALJ accurately considered her activities of daily living, including acknowledging that she took a break in caring for her grandchildren for a period

in 2014, and had a case manager to "help her with daily living tasks, such as paying bills and finding resources." R. 23. Additionally, the ALJ appropriately relied on Renee's daily activities as just one of several reasons to discount her subjective allegations. This is the ALJ's job, to determine the facts of a particular case and to resolve inconsistencies between a claimant's alleged impairments and his ability to work.  See Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996); see also Shively v. Heckler, 739 F.2d 987, 989-90 (4th Cir. 1984) (finding that because the ALJ had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight).

The ALJ's opinion was thorough and applied the proper legal standard, and I will not re-weigh the evidence. Accordingly, I conclude that the ALJ supported her analysis of Renee's subjective complaints with substantial evidence, and that Renee is capable of performing work at the level stated in the ALJ's opinion.

## CONCLUSION

It is **RECOMMENDED** that an order be entered **AFFIRMING** the final decision of the Commissioner, **GRANTING** summary judgment to the defendant, **DENYING** plaintiff's motion for summary judgment, and **DISMISSING** this case from the court's docket.

The clerk is directed to transmit the record in this case to Elizabeth K. Dillon, United States District Judge, and to provide copies of this Report and Recommendation to counsel of record.  Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days.  Any adjudication of fact or conclusion of law rendered herein by the undersigned that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings, as

well as to the conclusion reached by the undersigned, may be construed by any reviewing court as a waiver of such objection, including the waiver of the right to appeal.

                                        Entered:  July 25, 2022

                                        *Robert S. Ballou*

                                        Robert S. Ballou
                                        United States Magistrate Judge